**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **JOSHUA F. VANNI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CIVIL ACTION NO. 1:23-00261-KD-M** |
| ) | |
| **GMFS, LLC d/b/a GMFS MORTGAGE** ) | |
| **and SPECIALIZED LOAN SERVICES,** ) | |
| **LLC,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER

This action is before the Court on Defendants GMFS, LLC d/b/a GMFS Mortgage

("GMFS") and Specialized Loan Services, LLC's ("SLS") (collectively "Defendants") Motion for

Summary Judgment, (Doc. 35), memorandum in support thereof, (Doc. 37), and evidentiary

material in support thereof; Plaintiff Joshua F. Vanni's ("Plaintiff") Response in Opposition, (Doc.

41), and evidentiary material in support thereof; and Defendants' Reply, (Doc. 42). Upon

consideration and for the reasons set forth herein, Defendants' Motion, (Doc. 35), is **GRANTED in**

**part and DENIED in part** as follows: summary judgment is **GRANTED** as to Counts III and IV

of the Complaint, which Plaintiff abandons in his Response, but is **DENIED** as to Counts I, II, and

V.

## I.     BACKGROUND

In March 2017, Plaintiff obtained a $269,637 loan (the "Vanni Mortgage Loan" or the

"Loan") from GMFS to purchase a home at 751 Sue Lane in Mobile, Alabama. (Doc. 37 at 1; Doc.

41 at 1; Doc. 35-17 (copy of Note)). The interest rate on the Loan is 4.00% and the monthly

payment is $1,287.29. (Doc. 35-17 at 1). It is secured by a mortgage (the "Mortgage" or "Mortgage

Agreement") on the property. (Doc. 41-4) (copy of Mortgage). The parties agree that the Vanni

Mortgage Loan is a "federally related mortgage loan" within the meaning of 12 U.S.C. § 2602(1). (Doc. 41-1 at 1; Doc. 41-2 at 1; Doc. 41 at 1). While GMFS was the original lender and is the current holder of the Vanni Mortgage Loan, GMFS contracted with SLS in March 2018 to service the loan.[1] (Doc. 41-3 at 2–3; Doc. 37 at 1; Doc. 35-1). Both GMFS and SLS agree that they are "mortgage servicer[s]" within the meaning of 12 U.S.C. § 2605(i)(2) with respect to the Vanni Mortgage Loan. (Doc. 41-2 at 1; Doc. 41-1 at 1).

The borrower is obligated under the Mortgage to maintain property insurance and pay the lender through an escrow account a sum sufficient to cover taxes and insurance on the property. (Doc. 41-4 at 5–8). Per the Mortgage, "The insurance carrier providing the insurance *shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice*, which right shall not be exercised unreasonably." (Id. at 6) (emphasis added). Laura Ollier, a former SLS employee, explained in her deposition that borrowers are "required to have an insurance policy that meets the terms [of] the mortgage," but that there is no obligation for borrowers to have duplicative coverage. (Doc. 41-3 at 3).

Plaintiff carried property insurance through a policy with Gulfstream Property and Casualty Insurance Company ("Gulfstream") from the date of the Loan's issuance. (Doc. 41 at 3) ("From the beginning of the loan, the home was insured through a policy with [Gulfstream]. The policy renewed in March of each year and the annual premiums were paid through escrow without incident until 2021."). A February 2021 fax from Plaintiff's insurance agency, Schneider Insurance Agency Inc. ("Schneider Insurance"), requested that GMFS make a $3,286 premium payment to Gulfstream prior to that policy's effective date of March 1, 2021. (Doc. 35-2 at 1, 4). A few days later, that

---

[1] While Laura Ollier, former employee of SLS, declared that SLS "acted as subservicer of the loan," (Doc. 35-1 at 1), she clarified in her deposition that SLS has "handle[d] all the [day-to-day] servicing on this loan since 2018," including accepting payments, keeping accounting and records, sending correspondence, and handling the escrow accounts, (Doc. 41-3 at 3).

premium payment was sent from Plaintiff's escrow account to Gulfstream. (Doc. 41-3 at 4; Doc. 35-19 at 11). However, in July 2021, Gulfstream was liquidated. (Doc. 35-3 at 1). On August 27, 2021, incident to the liquidation, all Gulfstream policies were cancelled. (Id.). The Alabama Insurance Guaranty Association later issued Plaintiff a refund check for the unearned premium associated with Gulfstream's insolvency. (Doc. 35-4).

On August 10, 2021, a $7,664 premium payment was made to a separate insurance carrier, Centauri Specialty Insurance Company ("Centauri"), for an *additional* homeowners policy. (Doc. 35-19 at 8; Doc. 35-5). At the time the payment was made in August 2021, Plaintiff's property was already insured by Gulfstream. (Doc. 41-1 at 2; Doc. 41-2 at 2). Plaintiff's escrow balance dropped from $1,795.29 before the payment to –$5,868.71 after it. (Doc. 35-19 at 8). The Centauri policy was to be effective for one year beginning on August 27, 2021. (Doc. 35-5 at 2). A letter from GMFS to Plaintiff dated August 11, 2021, stated that GMFS "recently received replacement coverage" from Centauri on Plaintiff's property, that GMFS was unable to cancel Plaintiff's previous coverage, and that Plaintiff should contact his agent to cancel that policy. (Doc. 35-6 at 1). The letter also requested that Plaintiff immediately send to GMFS any refund received from the cancelled policy if he were to receive it so that GMFS could deposit the refund into Plaintiff's escrow account "to minimize the potential for an escrow shortage." (Id.). The letter went on to say that should GMFS not receive a refund in its office by the time of Plaintiff's "next escrow analysis, [his] payment amount [would] increase accordingly." (Id.).

Plaintiff submits that the Centauri premium payment was made by SLS "without any prior notice to Vanni and without his knowledge or permission." (Doc. 41 at 3; Doc. 41-11 at 5 ("I found out when I called the mortgage company that they had paid an insurance premium of $7,664 to Centauri Specialty Insurance Company, a company I had never heard of. The premium was paid without my knowledge or permission and the property was already insured.")). Meanwhile,

3

Defendants deny that they had a role in the request that the Centauri policy be issued and the premium paid. (Doc. 37 at 3). According to Defendants, the premium was paid because of an electronic data interchange request that SLS received from Schneider Insurance. (Doc. 37 at 3; see Doc. 35-7 ("SmartFlow Auto-Process Report" concerning the payment); see also Doc. 41-8 at 5 (SLS's response to Plaintiff's first set of interrogatories listing "8/10/2021 A new business EDI policy was received and updated for Centauri Specialty Insurance policy #CHP1033643, effective 8/27/21–22, premium $7,664.00.");[2] and Doc. 42-2 at 1 (Declaration of Richard Schneider) ("Centauri Insurance replaced all Gulfstream policies effective August 28, 2021. Schneider received an invoice for this Centauri policy and it was forwarded to GMFS for payment and the premium was paid.")).

Ollier testified in her deposition that she was unaware of any record indicating that SLS reached out to Plaintiff before making the $7,664 premium payment to Centauri. (Doc. 41-7 at 3–4). In addition, an August 18, 2021, email from Frank Schneider to Plaintiff reads:

> Attached is a quote from Frontline for Homeowners to replace the Gulfstream policy that is expiring 8/27/2021. The current Gulfstream policy is $3,286 and they have an agreement with Centauri to offer renewal quotes. The Centauri offer is much higher $7,664 so the Frontline quote is much better at $3,996. Can you call your mortgage company and tell them not to pay Centauri? If they've already paid for the Centauri policy we can cancel and get a full refund. You'll also get a refund from Gulfstream for the unearned balance to 3/1/2022.

(Doc. 42-1 at 1); (see also Doc. 42-2 at 1) ("On December 3, 2021, we emailed Vanni a form to cancel the Centauri policy effective 11/17/2021. These forms were not returned. Only the insured had the authority to cancel this policy.").

---

[2] Plaintiff's interrogatory #17 asked that SLS "[i]dentify each and every letter received by you from Plaintiff . . . which you treated or processed as a Notice of Error or Qualified Written Request within the meaning of 12 C.F.R. Section 1024.35 and 1024.36. As to each such letter, describe in detail every action you took in response to the letter." (Id. at 4).

In November 2021 State Farm Insurance Company ("State Farm") was updated as Plaintiff's property insurance carrier for the same 751 Sue Lane address.[3] Plaintiff's payment history depicts the $3,966 premium payment from Plaintiff's escrow account for the State Farm policy. (Doc. 35-19 at 7). GMFS sent Plaintiff a letter, on November 22, 2021, that was substantially the same as its August letter but that notified him of replacement coverage it received from *State Farm*. (See Doc. 35-8). In March 2022, Plaintiff called SLS and was advised of the Centauri policy, which was subsequently retroactively cancelled, effective August 2021.[4] (Doc. 41-8 at 5–6). Centauri issued Plaintiff a refund check of $7,664, representing the entire prior premium payment. (See Doc. 35-12). On April 16, 2022, Plaintiff sent GMFS a check for $7,200. (Doc. 35-13).

Plaintiff's January 2022 Escrow Account Disclosure Statement indicated an increase in his total monthly mortgage payment from $1,887.63 to $2,791, effective March 1, 2022. (Doc. 41-9 at 1). Plaintiff's February–June 2022 Mortgage Statements showed an increase in his monthly escrow payment (inclusive of property taxes and insurance) from $600.34 to $1,503.71. (Doc. 41-10 at 1, 3, 5, 7, 9, 11). According to Plaintiff, despite receiving the Centauri refund check in mid-April, GMFS demanded the elevated escrow payment of ~$1,504, which included payments for *both* the

---

[3] SLS's response to Plaintiff's interrogatory #17 shows the following notations with respect to November 2021:

> 11/17/21 Agent called in regarding the change of insurance but was unable to fully verify the account. The agent was advised to upload the policy information on the website. The borrower was calling Centauri Specialty to obtain his policy number and the agent will call back with that information. Borrower called in to verify that the policy information was received and updated for State Farm Insurance and advised that the agent just sent them in. The borrower was advised to allow two business days to receive.
> 11/18/21 The account was notated that a fax was received from State Farm Insurance.
> 11/19/21 The hazard line was updated with State Farm policy #01CUU2959, effective 11/17/21–22, premium $3,966.00.
> 11/22/21 A midterm substitution letter was sent to the borrower.

(Doc. 41-8 at 5). As noted *supra*, all Gulfstream insurance policies were cancelled effective August 27, 2021, (see Doc. 35-3 at 1), and as explained *infra*, Plaintiff's Centauri policy was retroactively cancelled the following year, also effective August 2021, (see Doc. 41-8 at 6).
[4] (See Doc. 41-8 at 6) ("04/01/22 A company cancellation request was received and updated for Centauri Specialty policy #CHP1033643, effective date of cancellation 08/27/21, issued 03/29/22. A company cancellation request was received and updated for Centauri Specialty policy #CHP1033643, effective date of cancellation 08/03/21, issued 03/22/22.").

cancelled Centauri policy and existing State Farm policy, until July. (Doc. 41 at 5). Effective July 1, 2022, Plaintiff's monthly escrow payment was reduced to $703.29, dropping his entire regular monthly payment to $1,990.58. (Doc. 41-10 at 13). Despite the new, lower escrow payment, the June 29, 2022, statement continued to show a past due amount due for each of March, April, and May of $2,791, leaving a total amount due for July 1 of $10,600.12. (Id.).

Plaintiff stated that when he attempted payments of what he "actually owed . . . they were either rejected or not applied." (Doc. 41-11 at 5). "The lone exception [to the proposition that Plaintiff's attempted payments were rejected] is a payment Vanni made in March 2022 in the amount of $2,000. That payment was not rejected, but it was held in SLS'[s] 'suspense' account and not applied to the loan." (Doc. 41 at 5; see Doc. 41-10 at 13 (June 29, 2022, statement showing an "Unapplied/Suspense" amount of $2,000 along with the lower escrow payment); Doc. 41-7 at 8–9 (Ollier deposition acknowledging same)). Ollier testified that she did not think either SLS's phone or online payments mechanisms would accept for payment less than the amount the system showed was owed for the month. (Doc. 41-7 at 7). Plaintiff typically made his payments over the phone or online. (Doc. 41-6 at 2).

In July 2022, Plaintiff's loan was placed in foreclosure. (Id. at 11; Doc. 35-15 at 18 (Mortgage Service Note History reflecting referral to foreclosure and foreclosure approval on July 12)). Plaintiff's loan balance was also accelerated. (Doc. 41-10 at 15). Ollier explained that there are criteria that govern whether a loan is referred to foreclosure "after so many months past due." (Doc. 41-7 at 11) ("It's usually honestly, it can be reviewed as soon as one month. It kind of just depends on what's going on with the loan. Exceptions can be made."). When Plaintiff's loan was accelerated, his payment history showed payments past due from February 2022, which is what triggered the foreclosure. (See id.). Plaintiff's August 2022 Mortgage Statement included $1,218.62

in additional attorney's and foreclosure-related fees. (Doc. 41-10 at 17–19; Doc. 41-7 at 12 (reading off these charges from the statement)).

Plaintiff's October 2022 Mortgage Statement showed a reinstatement amount of $16,861.69. (Doc. 41-10 at 22). According to Plaintiff, he and his wife decided to pay Defendant "what they claimed in order to save the home and stop the foreclosure sale," but "decided to send extra, just to be sure it covered the current payment due and was more than enough to reinstate." (Doc. 41-11 at 5). They therefore delivered GMFS $20,000. (Id.; Doc. 35-19 at 5 (showing a $20,000 "[s]ingle item receipt" on October 21)). Ollier testified that the $20,000 payment "[brought] the loan current" through December 1, 2022. (Doc. 41-7 at 13). Plaintiff's November 1 Mortgage Statement showed $3,319.81 due December 1. (Doc. 41-10 at 25). Included in that total is $1,995.43 in "Total New Fees Collected," which are fee-collection and default-related fees. (Id. at 25, 27). On January 17, 2023, SLS sent Plaintiff a Notice of Default and Notice of Intent to Foreclose "as a result of [Plaintiff's] failure to pay the 12/01/22 payment and the payments due each month thereafter." (Doc. 41-12 at 1). The letter provided that the "amount required to cure the arrears as of 01/17/23 [was] $5,499.59" and that Plaintiff had 33 days from that date to cure the default. (Id.). Plaintiff's October 2022 mortgage payment was his last to date. (Doc. 37 at 4; Doc. 35-19).

Within a month of receiving the notice of default, Plaintiff sent a purported Notice of Servicing Error ("NOE") to both GMFS and SLS. (See Doc. 35-9). Both GMFS and SLS admitted that the NOE accurately identified the Vanni Mortgage Loan, Plaintiff, and the Property and that it was mailed to Defendants' respective designated addresses for the receipt of notices of servicing error and qualified written requests. (Doc. 41-1 at 3; Doc. 41-2 at 3). Both letters were received February 21, 2023. (Doc. 41-14). The NOE set out that Defendants mistakenly paid Centauri without Plaintiff's instruction or permission; that this charge wrongfully increased Plaintiff's monthly payments; that Defendants failed to properly credit the funds received from the Centauri

refund; and that Defendants continued to treat the Vanni Mortgage Loan as if it was in default despite receiving Plaintiff's $20,000 check, in addition to charging late fees and other default-related charges. (Doc. 35-9). GMFS sent two response letters to Plaintiff's NOE dated March 6 and 30, respectively. (Docs. 41-15, 41-16). Ollier believed that SLS was the only entity that responded and that it was SLS's responsibility to do so. (Doc. 41-7 at 14). However, she was unaware of a system in place to track what actions SLS took in response to the NOE. (Id.). The March 30 response letter ultimately concluded that "the escrow shortage, payment increase, and credit reporting described in [Plaintiff's] dispute were not in error" and that "SLS is reporting information to the credit reporting agencies accurately." (Doc. 41-16 at 2). While the letter acknowledged receiving the $7,200 refund check and refunding it to Plaintiff's account on April 27, 2022, it did not explain how or why: the Centauri policy was purchased; Plaintiff's monthly escrow payments were elevated until that July; those elevated charges caused the Vanni Mortgage Loan to be referred to foreclosure; or Plaintiff's $20,000 check delivered that October did nothing to wipe out the foreclosure-related fees due December 1. (See id.). In support of their Motion, Defendants also attach a summary and timeline of events from Assurant, a "third-party vendor that assists SLS with managing the homeowners policies." (Doc. 41-7 at 2; see Doc. 35-14 (Assurant "360 Research Request Timeline")). In the report's "Remediation" section, it simply reads, "No error." (Doc. 35-14 at 6; see Doc. 37 at 4 ("The Assurant Investigation concluded that the escrow account was correctly maintained and that the credit reporting of the plaintiff's defaults was accurate.").

Notices of foreclosure were published in "Call News" on June 14, 21, and 28, 2023. (Doc. 41-17). The notice stated that Plaintiff had defaulted on the Vanni Mortgage Loan and that a foreclosure sale of the property would be held on August 3, 2023. (Id. at 2). On July 12, 2023, Plaintiff filed this lawsuit, alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq., and its implementing regulations (Count I) and defamation

(Count V) against both Defendants; and breach of the Mortgage Agreement and Note (Count II), wantonness (Count III), and wantonness per se (Count IV) against GMFS. (Doc. 1). The sale was cancelled after this suit was filed. (Doc. 41 at 9 n.4).

## II.    LEGAL STANDARD

District courts shall grant summary judgment when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant always bears the initial responsibility of informing the district court of the basis for its motion and identifying the parts of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c). Only when the movant has met his initial burden "does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party generally must use these same categories of evidence to support the inference that a material fact is genuinely disputed. Fed. R. Civ. P. 56(c).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). That is to say, the movant becomes entitled to judgment as a matter of law when the non-moving party fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other

facts immaterial."). In assessing whether the movant has met its burden, the Court should view the evidence and all factual inferences therefrom in the light most favorable to the non-movant and resolve all reasonable doubts about in the facts in his favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).

The substantive law identifies which facts are material. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id.; see also Cunningham v. AutoZoners, LLC, No. 12-CV-00538-KD-B, 2013 WL 6008566, at *6 (S.D. Ala. Nov. 13, 2013) ("However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment."). A dispute is genuine if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010) (en banc).

## III.   ANALYSIS

### A.  Count I: Alleged RESPA Violations Against Both Defendants

#### i.      Applicable Law

"RESPA is a consumer protection statute that imposes a duty on servicers of mortgage loans to acknowledge and respond to inquiries from borrowers." Bivens v. Bank of Am., N.A., 868 F.3d 915, 918 (11th Cir. 2017); see 12 U.S.C. § 2605(e). It confers a private right of action on those harmed by a servicer's failure to comply with RESPA's terms. § 2605(f). "To prevail on a RESPA claim, a plaintiff must show: (1) a defendant's failure to comply with a RESPA obligation; and[] (2) that she sustained actual damages[5] as a result." Rakestraw v. Nationstar Mortg., No. 21-12850, 2022

---

[5] RESPA also permits the recovery of statutory damages "in an amount not to exceed $2,000" "in the case of a pattern or practice of noncompliance with the requirements of this section." § 2605(f).

WL 656104, at *5 (11th Cir. Mar. 4, 2022) (per curiam). In the § 2605(e) context, Plaintiff must

show: (1) that Defendants are servicers; (2) that Defendants received a "qualified written request"

("QWR") from the borrower; (3) that the QWR related to the servicing of the loan; (4) that

Defendants failed to respond adequately; and (5) that Plaintiff is entitled to actual or statutory

damages. See Echeverria v. BAC Home Loans Servicing, LP, 900 F. Supp. 2d 1299, 1305–06

(M.D. Fla. 2012). RESPA, "as a remedial consumer-protection statute, should be construed liberally

in order to best serve Congress's intent." Renfroe v. Nationstar Mortg., 822 F.3d 1241, 1244 (11th

Cir. 2016).

     A QWR is a "written correspondence" that, *inter alia*, "includes a statement of the reasons

for the belief of the borrower . . . that the account is in error or provides sufficient detail to the

servicer regarding other information sought by the borrower." § 2605(e)(1)(B). RESPA's

implementing regulations describe two types of QWRs: NOEs[6] and requests for information

("RFI"). Gillaspy v. Wells Fargo Bank, N.A., No. 2:22-CV-193-RAH, 2024 WL 898887, at *6 n.7

(M.D. Ala. Mar. 1, 2024) (citing 12 C.F.R. §§ 1024.31, 1024.35(a), 1024.36(a)). Upon receiving a

QWR, the servicer must provide a "written response acknowledging receipt of the correspondence"

within five business days and take other responsive actions within specified time periods. Bivens,

868 F.3d at 918; see 12 U.S.C. § 2605(e)(1)(A), (e)(2). In essence, a "servicer must respond by

fixing the error, crediting the borrower's account, and notifying the borrower; or by concluding that

there is no error based on an investigation and then explaining that conclusion in writing to the

borrower." Renfroe, 822 F.3d at 1244 (citing § 2605(e)(2)[7] and 12 C.F.R. § 1024.35(e)(1)(i)). Per

---

[6] A QWR that "asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request." 12 C.F.R. § 1024.35(a).

[7] § 2605(e)(2) stipulates:

RESPA's implementing regulations,[8] a servicer must generally respond to a NOE within 30

business days by either:

(A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(B) Conducting a *reasonable investigation* and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, *a statement of the reason or reasons for this determination*, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i) (emphasis added).

**ii.    Analysis**

Defendants do not dispute that Plaintiff's NOE, (Doc. 35-9), constitutes a "notice of error"

under 12 C.F.R. § 1024.35 to which they were obligated to respond.[9] (Doc. 37 at 4–5; Doc. 42 at 4–

---

Not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall—
    (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
    (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
        (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
        (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
    (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
        (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
        (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

[8] The Eleventh Circuit recognizes a borrower's private right of action to sue the servicer under RESPA if the servicer fails to adequately respond to the borrower's NOE in violation of 12 C.F.R. § 1024.35(e)(1)(i). See Lage v. Ocwen Loan Servicing LLC, 839 F.3d 1003, 1007 (11th Cir. 2016) (per curiam).

[9] Regardless, the NOE, which charged that that Defendants mistakenly paid Centauri without permission; that this wrongfully increased Plaintiff's monthly payments; that Defendants failed to properly credit the funds received from the Centauri refund; and that Defendants continued to treat the Vanni Mortgage Loan as if it was in default despite receiving Plaintiff's $20,000 check appears to be a QWR asserting an "error" under multiple subsections of § 1024.35(b), including its catchall provision, covering "[a]ny other error relating to the servicing of a borrower's

5). Nor do Defendants contest that they are servicers of a federally related mortgage loan;[10] that the NOE related to the servicing of the Vanni Mortgage Loan; or Plaintiff's damages allegations.[11] Rather, Defendants contend that their response to Plaintiff's NOE was sufficient under RESPA and its implementing regulations. (See Doc. 37 at 4) ("[T]he response to the notice of error was timely provided to the plaintiff and it detailed the reasons that the investigation concluded [that] . . . no errors were made and no corrective action was taken because none was required.").

The Court agrees with Plaintiff that a jury question remains as to whether GMFS's substantive response letter, (Doc. 41-16), was sufficient to preclude Defendants' liability under RESPA. Specifically, there remain issues of fact as to whether GMFS/SLS's response was reasonable.

As detailed *supra*, Plaintiff and Defendants hotly dispute how and why the $7,664 Centauri premium payment was made. Putting that aside, the record reflects that Plaintiff sent GMFS a $7,200 refund check in mid-April 2022 once the Centauri policy was cancelled. (See Doc. 35-13). Yet Plaintiff's Mortgage Statements continued to demand elevated escrow payments of ~$1,504 until June 29. (See Doc. 41-10 at 7, 9, 11, 13). The same June 29 statement showed amounts due for each of March, April, and May of $2,791, leaving a total amount due for July 1 of $10,600.12. (Id.

---

mortgage loan." § 1024.35(b)(11); see also Guccione v. JPMorgan Chase Bank, N.A., No. 3:14-CV-4587 LB, 2015 WL 1968114, at *11 (N.D. Cal. May 1, 2015) (finding that escrow overcharge errors are "errors" for purposes of § 1024.35(b)).

[10] Defendants agree that the Vanni Mortgage Loan is a "federally related mortgage loan" within the meaning of 12 U.S.C. § 2602(1) and that they are "mortgage servicer[s]" within the meaning of 12 U.S.C. § 2605(i)(2) with respect to the Vanni Mortgage Loan. (Doc. 41-1 at 1; Doc. 41-2 at 1).

[11] The Eleventh Circuit recognizes that damages are an essential element in pleading a RESPA claim. Renfroe, 822 F.3d at 1246. Plaintiff claims to have suffered damages "as a proximate result of the insistence that he owed the monthly amounts inflated by the simultaneous charges for both the cancelled Centauri policy and the active State Farm policy," including "extreme stress and worry" that in turn caused him loss of sleep and depression and contributed to Plaintiff and his wife's subsequent separation. (Doc. 41 at 9). Plaintiff also prays for statutory damages. (Doc. 1 at 13; Doc. 41-11 at 7). The Eleventh Circuit has construed RESPA's language of "actual damages" broadly such that it "see[s] no reason why a plaintiff cannot recover non-pecuniary damages, such as emotional distress, under RESPA." Ranger v. Wells Fargo Bank N.A., 757 F. App'x 896, 902 (11th Cir. 2018) (per curiam). 12 U.S.C. § 2605(f)(1)(A)'s "as a result of" language also mandates a "causal link" between the alleged RESPA violation and resulting actual damages, Renfroe, 822 F.3d at 1246, the allegations of which Defendants again do not dispute.

at 13). And Laura Ollier explained that when Plaintiff's loan was referred to foreclosure in July 2022, it was "almost six" months past due. (Doc. 41-7 at 11). Moreover, though Plaintiff gave GMFS $20,000 in October 2022, which was "more than enough to reinstate" the Vanni Mortgage Loan, (Doc. 41-11 at 5), Plaintiff's November 1 Mortgage Statement showed $3,319.81 due December 1—including $1,995.43 in "Total New Fees Collected," (Doc. 41-10 at 25, 27).

Meanwhile, Defendants maintain that the amounts collected in escrow were compliant with RESPA, which permits adding a one-month cushion to the borrower's charges.[12] (Doc. 42 at 5; see also Doc. 37 at 4) ("The Assurant investigation concluded that the escrow account was correctly maintained and that the credit reporting of the plaintiff's default was accurate. There was no error in the handling of these accounts.")). To the extent that these were indeed errors—which is unclear from the record—Defendants' failure as servicers to "make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction" would violate 12 U.S.C. § 2605(e)(2). See Renfroe, 822 F.3d at 1246 (explaining that § 2605(e)(2) "makes past errors current by requiring servicers to fix errors they find upon reasonable investigation, including by issuing refunds as necessary").

Further, "[e]ven where a servicer concludes that no error occurred, RESPA mandates that the servicer, among other things, '[c]onduct[] a reasonable investigation.'" Diehl v. Money Source, Inc., No. 17-CV-125-WS-B, 2018 WL 2995721, at *6 (S.D. Ala. June 13, 2018) (quoting 12 C.F.R. § 1024.35(e)(1)(i)). As recounted *supra*, GMFS's substantive response letter made no mention, among other things, of how or why Plaintiff's monthly escrow payments were elevated until July 2022 even though GMFS received the Centauri refund check in mid-April or how or why Plaintiff's

---

[12] As far as the Court can tell, servicers are permitted to collect as much as a *two*-month cushion. See 12 C.F.R. § 1024.17(c)(1)(i) ("In addition, the servicer may charge the borrower a cushion that shall be no greater than one-sixth (1/6) of the estimated total annual payments from the escrow account."). Pursuant to the Mortgage, GMFS "may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA." (Doc. 41-4 at 5).

$20,000 check delivered that October did nothing to wipe out the foreclosure-related fees due December 1. (See Doc. 41-16). Thus, the Court cannot conclude as a matter of law that the letter, which found that "the escrow shortage, payment increase, and credit reporting . . . were not in error," (Doc. 41-16 at 2), was the product of a "reasonable investigation" and provided Plaintiff with "a statement of the reason or reasons" for the determination that no error occurred while servicing the Vanni Mortgage Loan. See 12 C.F.R. § 1024.35(e)(1)(i)(B); see also Diehl, 2018 WL 2995721, at *6 ("[T]he Court agrees with plaintiff that a jury question remains as to whether TMS performed any reasonable investigation . . . ."). Accordingly, Defendants' Motion for Summary Judgment, (Doc. 35), is **DENIED** as to Count I.

**B. Count II: Breach-of-Contract Claim Against GMFS**

The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. Dupree v. PeoplesSouth Bank, 308 So. 3d 484, 490 (Ala. 2020).

Plaintiff asserts a breach-of-mortgage claim against GMFS in Count II.[13] Defendants do not dispute that there exists a valid mortgage contract between the parties or Plaintiff's resulting damages. (Doc. 37 at 5–7; Doc. 42 at 6–8). Instead, Defendants generally focus on whether GMFS breached their agreement. (E.g., Doc. 37 at 5–6) ("It was the responsibility of Vanni to get the Centauri policy cancelled and the premium refunded. Any delay in that process is the fault of Vanni, not the fault of the defendants. There was not breach of contract and the plaintiff has no

---

[13] In any event, SLS, as party to neither the note, (Doc. 35-17), nor the mortgage, (Doc. 41-4), would not be liable under a breach-of-contract theory. See Gillaspy, 2024 WL 898887, at *4 ("Here, the relevant contracts are Gillaspy's Note and Mortgage, and SPS is a party to neither. Thus, SPS owes no contractual duty to Gillaspy, even as a servicer or agent to a party to the Note and Mortgage."); Nelson v. Nationstar Mortg., LLC, 504 F. Supp. 3d 1307, 1315 (S.D. Ala. 2020) ("A breach of contract claim is generally not cognizable against a mere servicer, which is not in contractual privity with the borrower.").

claim."). Plaintiff responds that the same evidence underlying his RESPA claim in Count I supports

his breach-of-mortgage claim in Count II. (Doc. 41 at 17). In particular, Plaintiff argues:

> Defendants exceeded the authority under the mortgage by imposing charges for both
> Centauri policy and the active policy and collecting those charges from Plaintiff[] through
> the drastically inflated monthly payment amount, even after receipt of the Centauri refund.
> Even after it reduced the monthly amount, GMFS continued to treat the inflated payment
> amounts as owed and Vanni as in default for failing to pay those amounts. And when it
> rejected his tender of payments in the amount actually owed, as described above, GMFS
> breach[ed] the mortgage's requirement that payments be applied to the escrow, principal and
> interest actually owed under the mortgage. Finally, the failure to apply the October 2020
> $20,000 payment to bring the loan current likewise violated GMFS['s] contractual
> obligation to apply received payments in accordance with what is owed under the mortgage.

> Defendants demanded reimbursement from Plaintiff for duplicative coverage beyond that
> required under the mortgage; they drastically increased the monthly payment amounts
> because of those payments, even after one of them was refunded; and they held Plaintiff in
> default for failure to pay the wrongfully inflated amounts. This is all reflected in the
> documents and information available to Defendants when they received the NOEs . . . . This
> is ample evidence upon which a jury could find that a servicing error was committed, and
> that any reasonable investigation of Defendants' own records would have revealed the error
> and the need for corrective action.

> Because there is substantial evidence upon which a jury could find that GMFS breached the
> mortgage, GMFS['s] motion is due to be denied.

(Id.). The Court agrees. That which prevents entry of summary judgment in Defendants' favor as to

Plaintiff's RESPA claim also reveals a jury issue as to whether GMFS breached the parties'

Mortgage Agreement.

Under the Mortgage, Plaintiff had the right to select the property insurance carrier of his

choosing, subject to GMFS's right of disapproval. (Doc. 41-4). Viewing the evidence and all factual

inferences therefrom in the light most favorable to Plaintiff, a jury could conclude that the Centauri

policy was selected and the premium was paid without his knowledge or permission. (Doc. 41-11 at

5).  But even if the jury determines that Schneider acted as Vanni's agent in agreeing to the Centauri

policy, the amount GMFS is allowed to collect is "not to exceed the maximum amount a lender can

require under RESPA," (Doc. 41-4 at 5)—a two-month cushion. See 12 C.F.R. § 1024.17(c)(1)(i).

Plaintiff submits ample evidence that GMFS, acting through SLS, breached the Mortgage

Agreement when it continued to charge him inflated escrow payments months after receiving the Centauri refund check and that it wrongfully initiated foreclosure on that basis.

Of course, the defendant's nonperformance alone is not enough to compel its liability for breach of contract. "Alabama law requires a party suing for breach of contract to show either fidelity to the terms of the contract during performance or that she has a legitimate excuse for her nonperformance." Blake v. Bank of Am., N.A., 845 F. Supp. 2d 1206, 1211 (M.D. Ala. 2012). The plaintiff's own performance means that he substantially performed his obligations under the contract, which "does not contemplate exact performance of every detail but performance of all important parts." Superior Wall and Paver, LLC v. Gacek, 73 So. 3d 714, 721 (Ala. Civ. App. 2011) (internal quotations omitted). This is a question of *fact* to be determined from the circumstances of each case. Id. Again, viewing the evidence and all factual inferences therefrom in the light most favorable to Plaintiff, he performed as required under the contract by attempting monthly payments of "what [he] actually owed," which "were either rejected or not applied." (See Doc. 41-11 at 5).

Defendants charge in their Reply, "A[s] set forth in the Schneider documents attached and described in the timeline above, the plaintiff abdicated his responsibility to cancel the insurance policies even though he knew there were duplicat[ive] policies in place." (Doc. 42 at 8). Defendants look past Plaintiff's evidence of the delivery of the Centauri refund check to GMFS post-policy cancellation and of Plaintiff's enlarged escrow charges from *both* the Centauri and State Farm policies for months thereafter. Therefore, with genuine issues of material fact concerning both Plaintiff's performance and GMFS's nonperformance at hand, Defendants' Motion is **DENIED** as to Count II. See Offshore Aviation v. Transcon Lines, Inc., 831 F.2d 1013, 1016 (11th Cir. 1987) (per curiam) ("Summary judgment is justified only for those cases devoid of any need for factual determinations.") (internal quotations omitted).

**C. Counts III and IV: Wantonness and Wantonness Per Se Claims Against GMFS**

Plaintiff elects not to proceed on the wantonness and wantonness per se claims asserted against GMFS in Counts III and IV of the Complaint. (Doc. 41 at 18). Accordingly, Defendants' Motion for Summary Judgment, (Doc. 35), is **GRANTED** as to Counts III and IV of the Complaint.[14]

**D. Count V: Defamation Claim Against Both Defendants**

**i.    Applicable Law**

To establish a prima facie case of defamation under Alabama law, the plaintiff must show: (1) that the defendant was at least negligent; (2) in publishing; (3) a false[15] and defamatory statement to another; (4) concerning the plaintiff; (5) which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable *per quod*). Delta Health Grp., Inc. v. Stafford, 887 So. 2d 887, 895 (Ala. 2004). "A plaintiff usually satisfies the publication element by proof of communication of the defamatory matter to someone other than himself." K-Mart Corp., Inc. v. Pendergrass, 494 So. 2d 600, 602 (Ala. 1986) (citing W. Prosser, The Law of Torts § 113, at 776 (4th ed. 1971)).

The import of the per se/*per quod* distinction is that "[w]hen a defamatory publication is actionable per se, the law infers injury to reputation as a natural consequence of the defamation and, as a result, the plaintiff is entitled to presumed damages." Nelson v. Lapeyrouse Grain Corp., 534 So. 2d 1085, 1092 (Ala. 1988); see also Marion v. Davis, 114 So. 357, 359 (Ala. 1927) ("In cases of

---

[14] Cf. Powell v. Am. Remediation & Env't, Inc., 61 F. Supp. 3d 1244, 1252 n.9 (S.D. Ala. 2014) ("Where a party wholly fails to respond to a summary judgment motion, the district court must make sure that it nonetheless is appropriate to enter summary judgment against the party that did not respond; in contrast, where the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned.").

[15] Because "[t]ruthful statements cannot, as a matter of law, have a defamatory meaning," truth is a "complete and absolute defense" to defamation. Fed. Credit, Inc. v. Fuller, 72 So. 3d 5, 10 (Ala. 2011).

libel,[16] if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, the law presumes damages to the reputation, and pronounces it actionable per se."). Words are also defamatory per se "if the directly tend to prejudice anyone in his office, profession, trade, or business, or in any lawful employment by which he may gain his livelihood." Kelly v. Arrington, 624 So. 2d 546, 549 (Ala. 1993). On the other hand, defamation *per quod* is not cognizable in the absence of special damages. Nelson, 504 F. Supp. 3d at 1322. "Special damages are the material harms that are the intended result or natural consequence of the slanderous statement, . . . and the general rule is that they are limited to material loss capable of being measured in money . . . ." Butler v. Town of Argo, 871 So. 2d 1, 18 (Ala. 2003) (internal quotations and citations omitted).

ii.     **Analysis**

Here, while Plaintiff attempts to plead special damages—including "mental and emotional pain, distress and anguish, humiliation and embarrassment, as well as damage to Plaintiff's credit and reputation," (Doc. 1 at 17)—the damages allegations as set out are not "material loss capable of being measured in money." See Butler, 871 So. 2d at 18. To defeat a motion for summary judgment with respect to a claim of defamation *per quod*, Plaintiff "had to produce substantial evidence indicating that he had suffered a material harm, capable of being measured in money damages, as a consequence of [Defendants'] statements," something he did not do. See Casey v. McConnell, 975 So. 2d 384, 390 (Ala. Civ. App. 2007). However, rather than point out the absence of evidence of special damages arising from the allegedly defamatory statements or dispute Plaintiff's claim that the statements in the notices of foreclosure published in "Call News" in June 2023 constitute libel

---

[16] "There are two types of defamation: libel, which involves the use of print media to publish the defamatory comment, and slander, which involves the oral expression of a defamatory comment." Blevins v. W.F. Barnes Corp., 768 So. 2d 386, 390 (Ala. Civ. App. 1999); see also First Indep. Baptist Church of Arab v. Southerland, 373 So. 2d 647, 648 (Ala. 1979) ("Libel is commonly perceived as defamation which springs from the publication of written or printed material.").

per se because they impact his reputation for creditworthiness, Defendants raise a truth defense to the defamation claim. (See Doc. 37 at 8) ("As the date of this filing, the plaintiff has not made a payment on his mortgage since October 2022. As of the date of the foreclosure notices, he had been in default for quite some time.").

First, while it is unclear under Alabama law whether the statements published in the June 2023 notices of foreclosure that Plaintiff defaulted on the Vanni Mortgage Loan qualify as libel per se, "the Court will not fill in the blanks on [Defendants'] behalf." See Nelson, 504 F. Supp. 3d at 1323;[17] cf. Fed. R. Civ. P. 56(f)(2) ("After giving notice and a reasonable time to respond, the court *may*: grant the motion on grounds not raised by a party.") (emphasis added). Second, as to Defendants' truth defense, there is sufficient evidence upon which a jury could conclude that the account delinquency was caused by Defendants' actions in imposing charges for insurance beyond those allowed by the mortgage. Defendants' Motion is **DENIED** as to Count V.

DONE and **ORDERED** this **13th** day of **August 2024**.

**s/ Kristi K. DuBose**
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[17] In Nelson, Judge Steele denied the motion for summary judgment as briefed because the movant "failed to demonstrate that the statements identified in the Amended Complaint cannot satisfy the proper standard for libel *per se*, so as to be actionable even without special damages." Id. A claim for libel per se may lie "if the language used exposes the plaintiff to public ridicule or contempt, thought it does not embody an accusation of crime," Marion, 114 So. 359, and Defendants similarly cite no case law to the effect that statements placed in foreclosure notices in similar scenarios cannot satisfy that standard.